Donald Len COFFMAN, Plaintiff,

v.

HAWKINS & HAWKINS DRILLING
CO., INC., et al.,
Defendants-Appellees.

AMERICAN CASING CREW, INC.,
Third-Party Plaintiff-Appellant,

v.

STATE AUTO & CASUALTY UNDER-
WRITERS and N. E. England & Associ-
ates, Inc., Third-Party Defendants-Ap-
pellees.

No. 77–1637.

United States Court of Appeals,
Fifth Circuit.

May 1, 1979.

Rehearing Denied June 4, 1979.

Clark A. Richard, New Orleans, La., for plaintiff.

Donald V. Organ, New Orleans, La., Roger Larue, Jr., Metairie, La., for State Auto.

H. Martin Hunley, Jr., David S. Kelly, New Orleans, La., for N. E. England.

James F. Holmes, New Orleans, La., for Hawkins & Hawkins, et al.

Before BROWN, Chief Judge, AINSWORTH, Circuit Judge, and CAMPBELL *, District Judge.

AINSWORTH, Circuit Judge:

American Casing Crews, Inc. (American) appeals from the district court judgment granting Hawkins & Hawkins Drilling Company, Inc. (Hawkins) indemnity from American in the amount of $61,500, plus costs and attorney's fees paid by Hawkins in its settlement of the claim of an injured worker. Our review of the record convinces us that the district court erred in finding that American breached its warranty of workmanlike performance and we therefore reverse.

* District Judge of the Northern District of Illinois, sitting by designation.

1. Hawkins employees operated the drawworks and, along with members of American's crew, the catline.

2. James Avant, American's foreman, was unsure whether his men had attached the catline

## I. The Facts

This action stems from an accident aboard a submersible oil drilling barge situated on Lake Borgne, Louisiana. Hawkins, the owner of the barge, hired American, an independent contractor, to run casing pipe, a protective lining for the rig's well hole. On the night of July 6, 1971, an American casing crew and a team of drillers employed by Hawkins went aboard the barge to conduct the joint operation of setting the pipe.[1] The original plaintiff in this cause, Donald Len Coffman, was the "stabber" on the American crew, responsible for holding the casing pipe vertical to ensure proper threading. Coffman worked from a movable "stabbing board," a platform made of tubing which was suspended from the derrick and attached to a "catline," a rope that was in turn strung through a winch, called a "cathead." This winch was connected to the drawworks on the floor of the barge. Hawkins furnished the stabbing board, catline and all other equipment involved in the stabbing process.[2] Because the sections of casing pipe differed in length, the stabbing board had to be raised and lowered repeatedly to enable Coffman to do his job. At various times through the night, employees of both American and Hawkins turned the cathead, reeling the catline in or out and thus changing the height of the board. When it reached the desired elevation, the board was secured by means of a "dog," a circular metal clamping device located on the catline. The operator of the cathead would close the dog, whose teeth would then bite into the catline, holding the rope taut and thereby keeping the board in place. The stabbing board was moved and secured in this manner between ten and fourteen times without incident before the accident. However, as the American and

to the stabbing board or Hawkins had completed the rigging before the American crew came aboard. Gerald Coats, another American employee, said that Hawkins had attached the line and board. According to Coffman, the American crew had worked approximately two hours "rigging this thing up" before the stabbing operation began.

Hawkins employees were running "the second to last joint of pipe," the board and Coffman suddenly fell approximately twelve feet.[3] American's foreman and other members of the American and Hawkins crews then inspected the stabbing equipment and discovered that the safety dog was "badly worn." The record does not reveal who (Hawkins or American personnel) was operating the cathead at the time of the accident.[4]

Coffman filed suit against Hawkins for $525,000 damages, alleging that the company's negligence and the unseaworthiness of its vessel caused the stabbing board to "fail and fall," resulting in "serious and permanent injury to his neck and back." Hawkins then brought a third party action for indemnity from American, claiming that the contractor violated its warranty of workmanlike performance. Subsequently, Hawkins settled with Coffman for the sum of $61,500. The remaining parties, Hawkins and American, thereafter submitted the issue of indemnity to the district court for decision.

The district judge found that James Avant, the foreman of American's casing crew, "was negligent in failing to inspect the safety dog," that "[a] cursory examination would have revealed" the dog's worn condition and that American had thus breached its warranty of workmanlike service. The district court further concluded that this breach proximately caused Coffman's injuries, that the shipowner's conduct did not prevent the contractor from performing in a workmanlike manner and that Hawkins was therefore entitled to indemnity from American in the amount of $61,500, plus costs and attorney's fees.

## II. Hawkins' Failure to Establish that American Breached Its Warranty

■ As we observed in *Parfait v. Jahncke Service, Inc.,* 5 Cir., 1973, 484 F.2d 296, under the rule of *Ryan Stevedoring Co. v. Pan Atlantic Steamship Co.,* 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133 (1956), independent shore-based contractors that go aboard a vessel "by the owner's arrangement or by his consent to perform service for the ship's benefit impliedly warrant to the shipowner that they will accomplish their task in a workmanlike manner. The essence of the contractor's warranty of workmanlike performance is to perform its work 'properly and safely.'" *Parfait v. Jahncke Service, Inc., supra,* 484 F.2d at 301. (quoting *Ryan*) The *Ryan* doctrine extends "beyond the traditional stevedore-vessel relationship to a situation," like that involved here, "in which a specialized service company comes aboard a drilling vessel" and purportedly "renders it unseaworthy." *Whisenant v. Brewster-Bartle Offshore Company,* 5 Cir., 1971, 446 F.2d 394, 399. If the owner of a vessel faces liability for injuries allegedly resulting from a breach of the contractor's warranty, it may seek indemnity for any damages owed the injured worker. To establish whether the shipowner is entitled to indemnity, a court must weigh "the conduct of both parties to determine: (1) whether the warranty of workmanlike performance was breached; (2) whether that breach proximately caused the injury, and (3) whether the shipowner's conduct prevented the workmanlike performance." *Garner v. Cities Service Tankers Corporation,* 5 Cir., 1972, 456 F.2d 476, 481.

■ In granting Hawkins indemnity, the district judge concluded that American breached its warranty, that this breach proximately caused Coffman's injuries and that Hawkins' conduct did not prevent the contractor's workmanlike performance. However, in our view Hawkins has not successfully shouldered its threshold burden of showing that American breached its warranty. The district court strongly empha-

---

**3.** The district court found that "[t]he board was elevated thirty to forty feet above the floor of the rig." A safety belt arrested Coffman's fall.

**4.** Avant said, "I'm fairly sure I was the only one that adjusted" the catline, but according to Coffman both Avant and a Hawkins driller had operated the cathead during the stabbing process and Coffman was unsure who was doing so when the accident occurred. Gerald Coats agreed that both "Jim Avant and the driller" had been operating the cathead.

sized that American's foreman neglected to examine the safety dog before the accident, but an independent contractor's failure to inspect equipment provided by the owner of a vessel is not enough, by itself, to constitute a breach, for the contractor's "warranty of workmanlike service does not put him under the duty to discover defects in equipment furnished him by the shipowner." *Waterman Steamship Corporation v. David,* 5 Cir., 1965, 353 F.2d 660, 666; *T. Smith & Son, Inc. v. Skibs A/S Hassel,* 5 Cir., 1966, 362 F.2d 745, 747; *Cia Maritima Del Nervion v. James J. Flanagan Ship Corp.,* 5 Cir., 1962, 308 F.2d 120, 123–24. Of course, if the contractor "[becomes] aware of the dangerous condition, [he] may not ignore it," *Johnson v. Warrior & Gulf Navigation Co.,* 5 Cir., 1975, 516 F.2d 73, 76, as "the warranty of workmanlike [performance] demands that a [contractor] must not continue to work its crew in the face of an unsafe or unseaworthy condition." *Brock v. Coral Drilling, Inc.,* 5 Cir., 1973, 477 F.2d 211, 216; *Lamar v. Admiral Shipping Corporation,* 5 Cir., 1973, 476 F.2d 300, 302; *T. Smith & Son, Inc. v. Skibs A/S Hassel, supra,* 362 F.2d at 747. But Hawkins has presented no evidence that American was aware before the accident of any safety problem related to the equipment used in the stabbing operation.

Furthermore, when an independent contractor such as American has no actual knowledge of "an unsafe or unseaworthy condition," it is "chargeable only with knowledge of defects discernible by a reasonable, but cursory, inspection and is not responsible for latent defects." *Lamar v. Admiral Shipping Corporation, supra,* 476 F.2d at 302; *Scott v. S.S. Ciudad De Ibague,* 5 Cir., 1970, 426 F.2d 1105, 1109; *Delaneuville v. Simonsen,* 5 Cir., 1971, 437 F.2d 597, 601. Though the lower court asserted

that "[a] cursory examination would have revealed the worn teeth" of the safety dog, the record merely shows that following the accident James Avant, American's foreman, and other American and Hawkins employees inspected the dog and found it "badly worn." There is no indication how extensive an examination was necessary to enable the men to make that judgment [5] and Hawkins presented no evidence that the worn condition of the dog was so apparent that American would have discovered it in a cursory inspection.[6] Moreover, the district judge found that the stabbing board "had been moved approximately 14 times without incident" before the accident. Thus, the dog had repeatedly performed properly and safely throughout the stabbing operation, a fact which seriously undermines the district court's conclusion that any defects in the device were readily evident.

The *Ryan* doctrine expresses the equitable goal that in maritime injury cases "liability should fall upon the party best situated to adopt preventive measures and thereby to reduce the likelihood of injury." *Italia Societa per Azioni Di Navigazione v. Oregon Stevedoring Co.,* 376 U.S. 315, 324, 84 S.Ct. 748, 754, 11 L.Ed.2d 732 (1964). *See Parfait v. Jahncke Service, Inc., supra* at 302. The district judge reasoned that American was that party, since "the injury-producing, defective equipment" was under its "supervision and control," leaving Hawkins "powerless to minimize the risk." That analysis is appropriate when an independent contractor has furnished defective equipment which causes an injury. *See, e. g., Italia Societa per Azioni Di Navigazione v. Oregon Stevedoring Co., supra.* Here, however, Hawkins not only supplied the equipment that created the unseaworthy condition but also furnished a crew which actively participated in the stabbing operation. Under the circumstances here, the

---

5. The record includes no photographs or diagrams of the barge or the equipment used in the stabbing operation. Accordingly, we must rely on the verbal descriptions contained in the depositions of Coffman, Avant, Gerald Coats, another member of the American crew, and two Hawkins employees who were aboard the barge on the night of the accident.

6. Even after inspecting the dog following the accident, Avant "couldn't say that . . . . couldn't really classify it whether it was safe or not, I know it had . . . previously held several times . . . ."

**156**

shipowner maintained joint control over the injury-producing equipment with the contractor and thus shared the power to minimize the risk. Accordingly, the district court's finding that American breached its warranty of workmanlike performance was clearly erroneous, Fed.R.Civ.P. 52, and we therefore reverse the judgment of indemnity.

REVERSED.