**Rey CASTILLO, Carlos Abesamis, Lauro Malinas, Emetrio Noble, and Jerry Ramos, Plaintiffs–Appellants,**

v.

**SPILIADA MARITIME CORPORATION and Spiliada MV, Defendants–Appellees.**

No. 90–3578.

United States Court of Appeals,

Fifth Circuit.

Aug. 5, 1991.

As Amended on Denial of Rehearing Sept. 10, 1991.

Richard J. Dodson, Alfred B. Shapiro, Baton Rouge, La., and Joseph E. Mayer, Quasha Wessely & Schneider, Washington, D.C., for plaintiffs-appellants.

Robert Hugh Murphy, Douglas L. Grundmeyer and Peter Brooks Sloss, Chaffe, McCall, Phillips, Toler & Sarpy, New Orleans, La., for defendants-appellees.

Before POLITZ, JOHNSON, and GARWOOD, Circuit Judges.

JOHNSON, Circuit Judge:

Plaintiffs–Appellants Rey Castillo ("Castillo"), Carlos Abesamis ("Abesamis"), Lauro Malinas ("Malinas"), Emetrio Noble ("Noble") and Jerry Ramos ("Ramos") (collectively, "Plaintiffs") are licensed Filipino seamen who were discharged by their employer, Defendant–Appellee Spiliada Maritime Corporation ("Spiliada"), after a wage dispute. Plaintiffs brought suit against Spiliada and the M/V SPILIADA alleging, *inter alia*, wrongful discharge and breach of contract. The district court found that the seamen had freely and voluntarily relinquished all claims against Spiliada by executing settlement agreements in which they released all their claims. The district court ruled, therefore, that the seamen did not act in good faith in renouncing the settlement agreements and filing the instant lawsuit. Because good faith is a jurisdictional requirement under the applicable seamen's wage statute, 46 U.S.C. § 10313, the district court dismissed Plaintiffs' suit. For the reasons set forth below, this Court reverses the district court's ruling and remands the case for further proceedings.

## I. FACTS AND PROCEDURAL HISTORY

The M/V SPILIADA is a Liberian flag vessel owned by Spiliada. The ship regularly operates within the territorial waters of the United States. Buenamar Compania

Naviera ("Buenamar"), a Greek company, manages the M/V SPILIADA. Buenamar uses Philgrecian Maritime Services ("Philgrecian"), a Philippine company, as its manning agent. In 1988, Philgrecian recruited Plaintiffs to work aboard the M/V SPILIADA for a one year period to commence on August 5, 1988. Philgrecian submitted Plaintiffs' employment contracts for approval with the Philippine Overseas Employment Administration ("POEA").[1] These contracts (the "POEA contracts") stated that Malinas was to receive a monthly salary of 55,000 Greek drachmas (approximately $407), and Castillo, Abesamis, Noble and Ramos were each to receive a monthly salary of 58,000 Greek drachmas (approximately $429).

Upon boarding the M/V SPILIADA, Plaintiffs handed the ship's captain sealed envelopes which Philgrecian had given them. Plaintiffs were not aware that the envelopes contained individual employment contracts which Philgrecian had secretly altered. The altered contracts inside the sealed envelopes (the "sealed contracts") stated that Malinas was to receive a monthly salary of 4,010 Philippine pesos (approximately $180), and Castillo, Abesamis, Noble and Ramos were each to receive a monthly salary of 6,006 Philippine pesos (approximately $276). The wage terms specified in the sealed contracts comported with the terms of a Bilateral Agreement entered between the Union of Greek Shipowners and the Philippine Officers and Seaman's Union. Buenamar had instructed Philgrecian to hire seamen according to the terms of the Bilateral Agreement.

Plaintiffs complained after they failed to receive the salaries specified in their POEA contracts. Eventually, they contacted inspector John Sansone ("Sansone") with the International Transport Workers Federation ("ITF"), an international labor secretariat. Sansone met with the M/V SPILI-ADA captain in New Orleans, Louisiana, in July 1989, to present Plaintiffs' case. When negotiations failed, the captain paid Plaintiffs the wages specified in the sealed contracts and discharged them.[2] The captain wrote "DUE ITF" as the reason for discharge in each of the plaintiff's books.[3]

Sansone referred Plaintiffs to Richard Dodson ("Dodson"), an American attorney in Baton Rouge, Louisiana, with experience in maritime law. Plaintiffs signed an agreement authorizing Dodson to represent them. Before meeting Dodson, however, Plaintiffs were repatriated at Spiliada's expense to the Philippines.

After Plaintiffs arrived in the Philippines, they discussed their wage dispute with Pompeyo Nolasco ("Nolasco"), a Filipino attorney whom Sansone recommended. The Filipino attorney soon established contact with Dodson in the United States. On August 1, 1989, Castillo, Abesamis, Malinas and Ramos (Noble was absent) met in Nolasco's office. Nolasco showed the four seamen a letter from Dodson. The letter advised that Dodson would soon file a suit in the United States on Plaintiffs' behalf, that Dodson would provide any necessary financial assistance until the United States litigation was resolved, and that Plaintiffs should inform Nolasco of any communication by Spiliada, Buenamar, or Philgrecian. With the four seamen's knowledge and consent, Nolasco sent Dodson a message stating that the seamen wished to continue prosecuting their claims in the United States.

At Buenamar's instigation, Philgrecian contacted Malinas to discuss a possible settlement. Malinas agreed to bring the other four seamen to talk with Captain A.C. Marmaras, a dock captain with Buenamar. On August 2, 1989, Malinas, Castillo, Noble and Ramos (Abesamis was absent) met with Captain Marmaras at the offices of Pandiman Philippines, Inc. ("Pandiman").[4]

1. The POEA is a Philippine government agency which regulates overseas employment of Filipinos. The POEA prescribes rules and regulations for the employment of seamen and approves their employment contracts.

2. The district court's findings of fact give conflicting dates as to when Plaintiffs were discharged: July 7, 1989, and July 7, 1990. *See* Minute Entry, June 25, 1990, at 2, 5. The correct date appears to be July 7, 1989.

3. Philippine law requires each Filipino seaman to maintain and to present to each new employer his seaman's book. The phrase "DUE ITF" referred to the involvement of the International Transport Worker's Federation. Plaintiffs feared that the notation unfairly labelled them as troublemakers and, as a result, that potential employers would be reluctant to hire them.

4. Pandiman is an organization that assists shipowners with problems, including seamen's claims.

Also present at the meeting was Frederick Clemo ("Clemo"), president of Pandiman. The four seamen advised Captain Marmaras and Clemo that they had Philippine and United States counsel, but their attorneys were not present. Nonetheless, Captain Marmaras and Clemo continued with settlement offers. Malinas, Castillo, Noble and Ramos eventually agreed to a settlement of $5,500 for each seaman, contingent upon acceptance of the same terms by the fifth seaman, Abesamis.

The next day, August 3, 1989, all five Plaintiffs returned to Pandiman's office. At this meeting, Crisolitio Dionido ("Dionido"), a Philippine attorney, was present. Clemo engaged Dionido to act as Plaintiffs' counsel for the settlement; Plaintiffs never requested that Dionido assist them. Dionido apparently spent the morning of August 3 explaining to Plaintiffs the terms of the settlement. Dionido also advised Plaintiffs that they could contact another attorney for further explanation. However, Dionido cautioned them that it was to their benefit not to contact their American lawyer. Finally, that afternoon, each of the Plaintiffs signed a settlement agreement, relieving Spiliada, Buenamar, Philgrecian, Pandiman, and the M/V SPILIADA from all obligations, in return for a payment of $5,500 and a change in the seamen's books as the reason for discharge from "DUE ITF" to "Mutual Consent." Plaintiffs also signed documents revoking any power of attorney they had previously given to Dodson.

On August 9, 1989, Plaintiffs met with their Philippine attorney Nolasco and C. John Caskey ("Caskey"), Dodson's associate. Plaintiffs signed affidavits averring that they agreed to the settlements only because of threats of blacklisting and that they were suffering from dire financial circumstances. On August 27, 1989, Plaintiffs filed the instant suit in federal district court. Plaintiffs' pleadings alleged claims for unpaid wages and statutory penalty wages and damages for breach of contract, wrongful discharge and blacklisting. Jurisdiction was based on 46 U.S.C. § 10313(i), as well as general admiralty and maritime jurisdiction under Article III of the United States Constitution and 28 U.S.C. § 1333. Spiliada filed a motion for summary judgment, asserting accord and satisfaction as a defense. Spiliada argued that Plaintiffs were barred from bringing suit as a result of the settlement agreements in which Plaintiffs released their claims. Plaintiffs then filed a cross-motion for summary judgment, contending that the releases were invalid as a matter of law because the releases were obtained through fraud, coercion, duress and without a full understanding of their rights.

The district court initially ruled that in order to exercise its jurisdiction under 46 U.S.C. § 10313(i), Plaintiffs had to establish their good faith in bringing the suit. Construing good faith as an issue of fact, the district court ordered an evidentiary hearing solely to determine "whether plaintiffs acted in good faith when they entered a settlement, renounced it, and then filed this lawsuit." After the hearing, the district court concluded that the releases were valid as a matter of law. As a result, the district court ruled that Plaintiffs did not act in good faith in renouncing the settlement agreements and filing the federal action. The district court then granted Spiliada's motion for summary judgment, dismissing the case for lack of subject matter jurisdiction. 740 F.Supp. 409. Plaintiffs filed a timely notice of appeal.

## II. DISCUSSION

Historically, seamen have enjoyed a special status in our judicial system. They enjoy this status because they occupy a unique position. A seaman isolated on a ship on the high seas is often vulnerable to the exploitation of his employer. Moreover, there exists a great inequality in bargaining position between large shipowners and unsophisticated seamen. Shipowners generally control the availability and terms of employment.

To shield seamen against unfair conduct by shipowners, Congress enacted special wage protection statutes. *See* 46 U.S.C. §§ 10313, 10504. Congress did not limit this statutory coverage to American seamen; rather, Congress extended protection to seamen who serve on a foreign vessel when located in a United States harbor. 46 U.S.C. § 10313(i). Jurisdiction over a wage claim made in good faith under 46 U.S.C. § 10313 is mandatory. *Abraham v. Universal Glow, Inc.*, 681 F.2d 451, 453 (5th Cir.1982) (citing *Dutta v. Clan Grahan*, 528 F.2d 1258, 1260 (4th Cir. 1975)). The determination of the seaman's good faith is a factual issue, subject to the clearly erroneous standard of review.

*Abraham,* 681 F.2d at 453. Because a plaintiff normally bears the burden of establishing federal jurisdiction, *McNutt v. General Motors Acceptance Corp.,* 298 U.S. 178, 179, 56 S.Ct. 780, 780, 80 L.Ed. 1135 (1936), Plaintiffs here must come forth with sufficient evidence of their good faith in bringing their section 10313 action. *Abraham,* 681 F.2d at 453.

■ A determination of good faith for section 10313 jurisdictional purposes is often intertwined with consideration of the merits of the claim. For example, the Fourth Circuit notes that a finding of lack of good faith is supported by the court's determination that a seaman's wage claims cannot succeed. *Morewitz v. Andros Compania Maritima, S.A.,* 614 F.2d 379, 382 n. 4 (4th Cir.1980). Still, "[a] claim may be asserted in good faith even though it ultimately may be found to be unmeritorious." *Dutta v. Clan Grahan,* 528 F.2d 1258, 1260 (4th Cir.1975). The jurisdictional question is not whether the seamen's wage claims will prevail: even claims which are considered "weak" may be brought in good faith. *See Dutta,* 528 F.2d at 1260. To dismiss for lack of subject matter jurisdiction, the district court must find that the wage claims are devoid of any prospect of success. *See Morewitz,* 614 F.2d at 382 n. 4.

In the instant case, the district court concluded that Plaintiffs did not act in good faith in renouncing their settlements and filing suit. The court focussed on the validity of Plaintiffs' releases. Plaintiffs argue that the district court erred in concluding that the releases were valid. Because of the district court's focus, this Court will review the law related to seamen's releases.

As a result of the policy that favors protecting the rights of seamen, the Supreme Court has emphasized that a seaman's release or settlement of his rights must be carefully scrutinized. *Garrett v. Moore–McCormack Co.,* 317 U.S. 239, 248, 63 S.Ct. 246, 252, 87 L.Ed. 239 (1942); *Wink v. Rowan Drilling Co.,* 611 F.2d 98, 100 (5th Cir.1980). Justice Story provides a lucid enunciation of the policy protecting seamen's rights:

[Seamen] are emphatically the wards of the admiralty; and though not technically incapable of entering into a valid contract, they are treated in the same manner, as courts of equity are accustomed to treat young heirs, dealing with their expectancies, wards with their guardians, and cestuis que trust with their trustees.... If there is any undue inequality in the terms, any disproportion in the bargain, any sacrifice of rights on one side, which are not compensated by extraordinary benefits on the other, the judicial interpretation of the transaction, is that the bargain is unjust and unreasonable, that advantage has been taken of the situation of the weaker party, and that *pro tanto* the bargain ought to be set aside as inequitable.... And on every occasion the court expects to be satisfied, that the compensation for every material alteration is entirely adequate to the diminution of right or privilege on the part of the seamen.

*Harden v. Gordon,* 11 F.Cas. 480, 485 (Cir. Ct.Me.1823) (No. 6,047) (quoted in *Garrett v. Moore–McCormack Co.,* 317 U.S. 239, 246–47, 63 S.Ct. 246, 251, 87 L.Ed. 239 (1942)). Likewise, Congress has recognized the validity of this policy by providing that "[n]otwithstanding a release signed by a seaman under section 10312 of this title, a court having jurisdiction may set aside, for good cause shown, the release and take action that justice requires." 46 U.S.C. § 10313(e).

■ The burden of proof in establishing the validity of a seaman's release is on the shipowner. The shipowner must show that the seaman's release "was executed freely, without deception or coercion, and that it was made by the seaman with full understanding of his rights." *Garrett,* 317 U.S. at 248, 63 S.Ct. at 252. On a motion for summary judgment, the burden is a heavier one because the shipowner must conclusively demonstrate the absence of a genuine issue of material fact. Fed. R.Civ.P. 56(c); *Halliburton v. Ocean Drilling & Exploration Co.,* 620 F.2d 444, 445 (5th Cir.1980). Spiliada argues that *Garrett's* allocation of the burden of proof is inapplicable here because subject matter jurisdiction was not an issue in *Garrett.* In addition, Spiliada contends that Plain-

tiffs' burden to establish jurisdiction overrides a shipowner's burden to establish the validity of a seaman's release. This Court fails to read *Garrett* in such a limited manner. Nothing in *Garrett* even remotely suggests that the allocation of the burden of proof would be any different for jurisdictional purposes. Further, Spiliada's reasoning conflicts with the special deference given to seamen. The policy behind opening this country's courts to foreign seamen directs that a seaman's burden to establish jurisdiction should not be more onerous than the seaman's burden to succeed on the merits.

 Courts have articulated various factors which may be relevant to an appraisal of a seaman's understanding of his rights. For instance, *Garrett* acknowledged that the nature of the legal advice available to the seaman at the time of signing the release is relevant. 317 U.S. at 248, 63 S.Ct. at 252. Other facts relevant to the analysis include the adequacy of the consideration, whether the parties negotiated at arm's length and in good faith, and whether there was the appearance of fraud or coercion. *Stipelcovich v. Sand Dollar Marine, Inc.*, 805 F.2d 599, 606 (5th Cir. 1986); *Borne v. A & P Boat Rentals No. 4, Inc.*, 780 F.2d 1254, 1256–57 (5th Cir.1986). If a genuine issue of material fact exists concerning the validity of the procurement of the release, the seaman is entitled to a jury determination on the issue. *Durden v. Exxon Corporation*, 803 F.2d 845, 847–48 (5th Cir.1986).

Here, the district court found that Plaintiffs' releases were valid because Plaintiffs freely and voluntarily released all claims in arm's length negotiations. The court discredited Plaintiffs' contention that they received inadequate explanation of their rights under foreign law. The court explained that Plaintiffs could have contacted their United States counsel, that the absence of an attorney does not automatically require abrogation of a settlement agreement, that Phillipine attorney Dionido explained the settlement documents to them, and that Plaintiffs received adequate consideration for the settlement.

 On appeal, a district court's conclusion regarding the validity of a seaman's release will be reversed only if the conclusion is clearly erroneous. However, after reviewing Plaintiffs' pleadings and the record, this Court is persuaded that the district court did indeed clearly err in concluding that Plaintiffs executed the releases freely, without deception or coercion, and with a full and complete understanding of their rights.[5] Several important reasons lead us to this conclusion.

First, Plaintiffs offered evidence that language barriers prevented them from fully understanding the settlement documents. The agreements were written in English, a foreign language to Plaintiffs,[6] and contained sophisticated legal terminology. It may be true that Dionido explained part of the settlements in Plaintiffs' native language, but any doubts this Court may have are enhanced by one inescapable factor: Dionido *was* an agent of Buenamar, the Greek company which manages the M/V SPILIADA; Dionido *was not* Plaintiffs' representative.

Second, Plaintiffs have offered substantial evidence that they were coerced into agreeing to the settlements with threats that charges would be filed against them with the POEA and that they would be blacklisted. As the threats of blacklisting endangered the possibility of future employment in their established trade, Plaintiffs reasonably could have been intimidated into settling. Captain Marmaras admitted he informed Plaintiffs that, no matter what, they would never work on any Buenamar-managed vessel again. Additionally, if Plaintiffs did not acquiesce, the leprous notation "DUE ITF" would remain on their seamen's books. Thus, the evidence of coercion was not so lacking that the

---

**5.** Despite the clearly erroneous standard of review, there is precedent in this Circuit for reversing a district court's conclusion concerning a seaman's understanding of the consequences of a release. *See, e.g., Bass v. Phoenix Seadrill/78, Ltd.*, 749 F.2d 1154, 1162 (5th Cir.1985); *Halliburton*, 620 F.2d at 445.

**6.** Plaintiffs' native language is Tagalog. Apparently, Plaintiffs speak a minimal amount of English.

district court was justified in totally discrediting it. In any event, under *Garrett,* Spiliada had the burden to show the lack of coercion. In light of Plaintiffs' evidence, Spiliada failed to carry its burden. Hence, the possibility of coercion is a question of material fact which precludes summary judgment.

■ Finally, and most important, the source and quality of legal counsel received by Plaintiffs during the settlement negotiations must, by any rational standard, be characterized as deeply disturbing. The district court found that Plaintiffs' failure to contact their United States counsel was of their own volition, and further stated that Dionido fully explained the settlement documents to Plaintiffs. While it is true that a court need not invalidate a settlement simply because of the absence of counsel during settlement negotiations, *Durden,* 803 F.2d at 845,[7] the circumstances of this case warrant a closer review. Before Buenamar's Captain Marmaras first met with Plaintiffs in the Phillippines, Plaintiffs were being represented by Dodson in the United States and Nolasco in the Phillippines. Buenamar undertook to contact and meet with Plaintiffs outside the presence of Plaintiffs' counsel, despite certain knowledge of Plaintiffs' professional relationships with Dodson and Nolasco. Any explanation or assistance given by Dionido cannot account for even a minimum level of proper legal representation. It is undisputed that Spiliada's agent procured Dionido's presence and that Plaintiffs never requested, nor expressly consented to, Dionido's representation. Dionido made no independent investigation of Plaintiffs' claims, and could hardly be considered disinterested in providing legal advice. The case for inadequate representation is strong here where Plaintiffs' sole legal advice during settlement negotiations comes from an attorney provided by a totally adverse party. The district court could only find that Plaintiffs could have

telephoned Dodson in the United States at any time during the negotiations: but even the significance of this fact is mitigated by Dionido's alleged admonition to Plaintiffs that contact with Dodson would result in negative consequences.

As for the quality of the explanation to Plaintiffs of their rights, there is serious concern. Spiliada contends that Plaintiffs were told and understood the settlement agreements releasing all their claims. Plaintiffs argue that no one explained to them their rights under United States law. Neither Dionido nor Nolasco were even familiar with United States statutory remedies. We do not decide here whether the validity of a seaman's release depends in part on knowledge of his rights under all possibly applicable laws.[8] Together with the other circumstances outlined above, though, and combined with the fact that Plaintiffs previously agreed to institute a lawsuit in the United States, Plaintiffs' ignorance of their rights under United States law further supports Plaintiffs' position that there is a genuine issue of material fact concerning whether they lacked a full understanding of their rights when executing the releases.

For these reasons, this Court concludes that the district court erred in ruling that Plaintiffs' releases were valid as a matter of law. Plaintiffs' evidence creates genuine issues of material fact as to whether the releases were executed freely, without deception or coercion, and with full understanding of their rights. Consequently, Plaintiffs are entitled to a trial proceeding in which they might attempt to establish the invalidity of the releases. By resting its good faith determination upon the validity of the releases, the district court did not consider whether Plaintiffs' wage claims, absent the releases, were made in good faith. Plaintiffs' claim that they were discharged without good cause. This claim is not disputed by any evidence in the record. At the same time, there is no evidence to justify the notation "DUE ITF" in Plain-

---

**7.** Although a court may uphold a release even when the seaman is not represented by his own attorney, *Charpentier v. Fluor Ocean Services, Inc.,* 613 F.2d 81, 84 (5th Cir.1980), this Court has repeatedly emphasized the importance of counsel in determining whether the seaman fully understood his rights and the consequences of releasing those rights. *See Stipelcovich,* 805

F.2d at 606; *Borne,* 780 F.2d at 1258; *Bass,* 749 F.2d at 1163.

**8.** *But see Lewis v. Texaco, Inc.,* 527 F.2d 921, 925 (2d Cir.1975) (seamen's releases did not bar suit where the seamen were not made fully aware of their statutory rights prior to settlement).

tiffs' books or Captain Marmaras' statement that Plaintiffs could not work on any ships managed by Buenamar in the future. In sum, this Court is convinced that Plaintiffs made a sufficient showing of good faith in filing the instant suit to impose statutory jurisdiction under section 10313.

## III. CONCLUSION

 Seamen, as wards of the court, are entitled to a careful review when a district court refuses to exercise jurisdiction over their claims. We are convinced that federal courts must remain vigilant in protecting the rights of seamen, whether foreign or domestic, in their relations with their employer. This protection comports with our nation's long history of concern and solicitude for seamen with employment disputes. The settlement of wage disputes between shipowners and seamen must be closely scrutinized. Where, as here, the shipowner blatantly circumvents the seamen's retained counsel to negotiate with the seamen personally and further to provide an attorney of the shipowner's own choosing purportedly to assist the seamen, the court need not give great deference to the validity of the settlement. The district court erred in ruling that Plaintiffs' releases are valid as a matter of law and in refusing to exercise jurisdiction over Plaintiffs' suit. Therefore, the district court's judgment is reversed and the case remanded for further proceedings consistent with this opinion.

REVERSED and REMANDED.

GARWOOD, Circuit Judge, specially concurring:

I concur on the understanding that we do not hold that plaintiffs have established that the releases are invalid as a matter of law, but that we rather hold that on the evidence recited their validity is sufficiently a question of fact so that the releases do not preclude the required good faith in bringing this suit that would otherwise appear to be clearly satisfied.

## ON PETITION FOR REHEARING

Sept. 10, 1991.

Before POLITZ, JOHNSON and GARWOOD, Circuit Judges.

JOHNSON, Circuit Judge:

In its petition for rehearing, Spiliada Maritime Corporation correctly notes that the plaintiffs on remand do not have a right to a *jury* determination regarding the validity of releases which they had signed. The suggestion in our original opinion—937 F.2d 240—that the plaintiffs *did* have a right to a jury determination, therefore, is erroneous. This error, however, does not change either our analysis or the result of the case. While we do not hold that the releases are invalid as a matter of law, we maintain our conclusion that there is a sufficient question of fact regarding the validity of the releases that the district court should exercise jurisdiction over the plaintiff's wage claim.

The sentence located on page 247 of our original opinion which reads [Editor's Note: The correction has been incorporated in the publication of this opinion.] In all other respects, the petition for panel rehearing is DENIED.