# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

December 17, 2008

Charles R. Fulbruge III
Clerk

No. 07-31044

In Re: In the Matter of the Complaint of Cardinal Services Inc as Owner of the L/B W Lopez Official No 1060683 for Exoneration from or Limitation of Liability

---------------------------------------------

CARDINAL SERVICES INC

Plaintiff - Appellee

v.

OMEGA PROTEIN INC

Defendant - Appellant

v.

CLIFTON LEWIS; GEORGE DECLOUETTE

Movants - Appellees

---------------------------------------------

In Re: In the Matter of the Complaint of Omega Protein Inc as Owner of the F/V Raccoon Point Official No 532143 for Exoneration from or Limitation of Liability

OMEGA PROTEIN INC

Plaintiff - Appellant

v.

CARDINAL SERVICES INC; CLIFTON LEWIS

No. 07-31044

Defendants - Appellees

---

Appeal from the United States District Court
for the Western District of Louisiana
6:00-CV-1910

---

Before WIENER, GARZA, and DeMOSS, Circuit Judges.

PER CURIAM:[*]

On August 16, 2000, a fishing vessel owned and operated by Appellant Omega Protein, Inc. ("Omega") collided with a lift boat owned and operated by Appellee Cardinal Services, Inc. ("Cardinal"). On appeal, we consider whether the district court erred in assigning fault equally between Omega and Cardinal, and whether the court erred in striking a release executed by Clifton Lewis, a seaman who was injured during the collision. Finding no error, we affirm.

I.

Omega and Cardinal commenced this action by filing separate petitions for exoneration or limitation of liability. Each sought recovery under the law of general maritime negligence. Additionally, three injured seamen filed claims. All matters arising from the collision were consolidated into a single proceeding. To determine the validity of the seamen's releases, the district court held an evidentiary hearing on December 20, 2002 and issued oral rulings on July 15, 2004. To determine fault for the collision, the court conducted the first phase of a bench trial from November 6–8, 2006. Preliminary rulings and findings were issued on November 9, 2006. The court conducted the second phase of the bench trial, concerning damages and remedies, from March 14–16, 2007 and issued

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

oral rulings on March 21, 2007. Final judgment was entered on August 16, 2007 and amended on September 19, 2007. Omega's timely appeal followed. We have jurisdiction pursuant to 28 U.S.C. § 1291.

A.

Around 9:15 p.m. on August 16, 2000, Omega's fishing vessel F/V RACCOON POINT ("RACCOON") and Cardinal's lift boat L/B W. LOPEZ ("LOPEZ") collided in Freshwater Bayou Channel, several miles south of Intracoastal City, Louisiana. RACCOON was headed north to unload the day's catch. It was 168 feet long, 32 feet wide, and drew approximately 11 feet. LOPEZ was headed south toward the Gulf of Mexico with a full load of fuel and water. It was 90 feet wide and drew 10.5 to 12 feet. At the helm of RACCOON was Richard Robbins, a pilot for Omega. RACCOON's captain, Steven Kell, was not in the wheelhouse at the time of the collision. At LOPEZ's helm was Edward Nichols, the master, accompanied by seaman Joe Clark, who acted as lookout.

Approximately 15 minutes before the collision, Robbins initiated radio contact. He and Nichols agreed to a one-whistle (port-to-port) pass. Robbins believed that LOPEZ drew no more than six feet. Similarly, Nichols believed that RACCOON could travel in shallow depths. As Nichols proceeded down the channel, he steered LOPEZ as close to the channel's western edge as he believed was safely possible. As LOPEZ approached beacon 13, there was less than three feet of water under its hull, and Nichols steered LOPEZ closer to the center of the channel. Nichols stated that when the vessels were still 200 or 300 feet apart, he thought the passing would be close, but still possible. In the final minute before collision, Robbins repeatedly radioed LOPEZ to advise that it was straying into RACCOON's side of the channel. Seconds before the collision, Nichols reversed the engines of LOPEZ in an attempt to stop. Nevertheless, the vessels collided near beacon 12, on the eastern side of the channel.

At trial, the parties hotly contested the depth of the Freshwater Bayou Channel. The channel is 250 feet wide beacon-to-beacon, but the precise depth near the site of the collision was not established. Nichols testified that the channel is 15 to 17 feet deep in the middle, but considerably less than ten feet deep at the sides. He stated that shoaling on the sides of the channel created a "bottleneck" where the collision occurred. Cardinal advanced the theory that the one-whistle pass was arranged based on a mistaken assumption held by both Nichols and Robbins, namely that the other pilot could steer safely to one side of the channel without running aground. Cardinal argued that this assumption caused the collision, because had either pilot known of the other vessel's draft, he would have recognized that the vessels could not safely pass between beacons 11 and 12 without "trading paint." Cardinal's expert, Douglas Halsey, opined that the pilots' mutual error caused the collision, and that each was at fault for agreeing to the ill-fated port-to-port pass. Halsey gave his opinion at the end of the bench trial, after he had heard the testimony of the fact witnesses and viewed the exhibits. In light of this evidence, Cardinal argued that LOPEZ and RACCOON were equally at fault for the collision.

Conversely, Omega's fact witnesses and expert witness testified that the channel was deep enough for the two vessels to pass safely. The witnesses stated that the channel is 15 to 17 feet deep in the middle, and 12 feet deep near beacon 12. Robbins testified in a deposition (which was submitted to the court as a joint trial exhibit) that after the collision, when RACCOON's bow was stuck in the mud, the current swung the stern into the channel. Robbins stated that, despite the 168-foot vessel occupying the eastern side of the channel, other vessels drawing twelve feet passed safely around its stern. Omega posited that the channel was at least twice as wide as the vessels' combined width, and surmised that LOPEZ strayed into the eastern side of the channel because it is not

maneuverable, and was pushed eastward by the wind and current. Thus, Omega argued that LOPEZ was 100% responsible for the collision.

The district court took the view espoused by Cardinal: the collision resulted from the misjudgment of the pilots of RACCOON and LOPEZ. The court found that the passing agreement was destined to lead to a collision given the fact that both vessels were heavily laden and would need to stay close to the center of the channel to avoid running aground. However, neither pilot believed that the other's vessel was similarly weighted down, and neither inquired over the radio. The court found that the pilots positioned their vessels as close to their respective sides of the channel as safely possible, LOPEZ to the west and RACCOON to the east, but a collision occurred nevertheless: "each of them believed the other one could give it more room, when in fact, given the load carried by the two vessels, neither could." The court accepted the opinion of Halsey on this matter, finding it to be "very persuasive and well grounded within the facts." The court noted that Omega's expert John Manders had failed to account for LOPEZ's deep draft: "Omega's own expert opined that [LOPEZ] would draw no more than 5 feet, or something in that neighborhood, in making his determinations." This assumption was undermined by the "eminently credible" testimony of Nichols that LOPEZ drew between 10 and 12 feet.

The court ruled out several possible causes of the collision. It found that neither party violated a formal rule designed to prevent collisions, rendering inapplicable a presumption of fault. See The Pennsylvania, 86 U.S. 125 (1873). The court found negligence per se theories inapplicable, and that the following did not cause the collision: pilot fatigue, outdated nautical charts, a lack of corporate policies governing passing situations, Robbins's revoked pilot license, violations of the lookout rule, a violation by the burdened vessel against the privileged vessel, a violation of the narrow channel rule, failure to sound the danger signal with a five-whistle blast, or the LOPEZ crossing the centerline of

the channel. The court reiterated that the collision was caused by the pilots' mistakes in navigation, and found each party 50% at fault.

B.

Clifton Lewis was a mate on board RACCOON. He was in the galley at the moment of the collision. Upon impact, he fell against a table, hitting his left side and bumping his right leg. Fellow seamen stampeding for the exit knocked him down a second time. After the collision Lewis complained of pains, but at Omega's request remained on the vessel. He had little sleep on the night of the collision, and only returned to shore the following evening. At that point, Omega asked him whether he wished to settle his claims. He stated that he wished to see a doctor. Because he had nowhere else to sleep, Lewis slept in his car that night. The next morning, August 18, 2000, Lewis was examined by Dr. Michael Duval, an orthopedic surgeon. Omega hired Dr. Duval to evaluate the injuries suffered by its seamen in the collision. Dr. Duval concluded that Lewis sustained no serious injuries, only some soreness.

Shortly thereafter, Lewis met with attorney Alan Breaud. Omega hired Breaud to settle potential injury claims against it arising from the collision. Breaud briefly spoke to the seamen as a group, and then conferred one-on-one with each seaman to explain the seaman's rights and to obtain a release of potential claims for $500. During his meeting with Lewis, Breaud stated that the money was a "gift" and a "windfall" to compensate him for his fear and confusion during the collision, and to settle potential injury and maintenance and cure claims. He told Lewis that his leg and side "won't give you any permanent problems." Lewis testified that he relied on Dr. Duval's assessment. He signed the release, cashed the $500 check, and returned to work a few days later.

After working for several days, Lewis experienced pain and left the vessel. Six weeks after the collision, he was diagnosed by a different doctor with two-level disc herniation. He sued Omega and Cardinal for maintenance and cure as

well as personal injury under the Jones Act and general maritime law. Omega raised the defense of accord and satisfaction based upon the release.

The district court held that Omega did not prove that Lewis had validly released his personal injury claims. The court noted that Dr. Duval's diagnosis was wildly off the mark: instead of just soreness, Lewis suffered from a very serious injury. Consequently, "Lewis did not have an informed understanding about his medical condition or his legal rights because that was based upon a misunderstanding of the medical condition when he executed the release. To the contrary, he had been told that in effect there was nothing wrong with him of a permanent nature . . . and that he would be fine in a few days." As a result, the court found it "impossible" to believe that Lewis knew what he was signing away. The court also found that the $500 paid to Lewis represented "an egregious undervaluation" of his claims, further indicating that he did not understand his rights or his medical condition. Moreover, the court questioned Lewis's capacity to execute the release because Lewis had little education and had slept very little before executing the release.

## II.

As with any bench trial, following a maritime limitation case tried to a district court, the appellate court reviews findings of fact for clear error and questions of law de novo. See In re Mid-South Towing Co., 418 F.3d 526, 531 (5th Cir. 2005). Questions of fault, including determinations of causation, are factual issues, and may not be set aside unless clearly erroneous. Id.; Trico Marine Assets Inc. v. Diamond B Marine Servs., Inc., 332 F.3d 779, 786 (5th Cir. 2003). "If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." Anderson v.

7

Bessemer City, 470 U.S. 564, 573-74 (1985). "Findings based on the credibility of witnesses demand even greater deference." Tokio Marine & Fire Ins. Co. v. FLORA MV, 235 F.3d 963, 970 (5th Cir. 2001) (citing FED. R. CIV. P. 52(a); Anderson, 470 U.S. at 575). "If a finding is based on a mixed question of law and fact, this court should only reverse 'if the findings are based on a misunderstanding of the law or a clearly erroneous view of the facts.'" Bertucci Contracting Corp. v. M/V ANTWERPEN, 465 F.3d 254, 259 (5th Cir. 2006) (quoting FLORA MV, 235 F.3d at 966).

Omega raises three issues on appeal. It argues that the district court erred in: (1) finding that the collision was jointly caused by Nichols and Robbins due to the pilots' erroneous belief that their vessels could pass safely, and consequently, that Omega and Cardinal were each 50% responsible for damages; (2) relying on the testimony of Douglas Halsey; and (3) striking Lewis's release.

A.

We first turn to Omega's arguments concerning causation and fault for the collision. Omega insists that the evidence is conclusive that Freshwater Bayou Channel was wide enough and deep enough for both vessels to pass safely, and that the district court clearly erred in holding otherwise. Omega also argues that the court erroneously ruled that it was not relevant that LOPEZ crossed into the eastern side of the channel. Omega avers that RACCOON was aground at the moment of impact, and surmises that it was already outside of the channel. Thus, it believes that RACCOON could not have been at fault in any way for the collision. In response, Cardinal argues that the district court's findings were not clearly erroneous in light of the testimony and evidence in the record. Cardinal maintains that it is "easily conceivable that both vessels were traveling in the channel as far to their respective sides as they possibly could," and that neither vessel could give room. Cardinal asks that we affirm the finding that the pilots

were equally at fault because they "ignorantly" agreed to a port-to-port pass that was not possible based on the vessels' respective drafts and widths.

Having reviewed the record in its entirely, we do not believe that the district court's findings regarding the cause of the collision are clearly erroneous. See Anderson, 470 U.S. at 573-74. Nichols testified that LOPEZ was as far to the western side of the channel as was safely possible immediately before the collision. Each pilot assumed that the other had a shallow draft and could get out of the way. The court found Nichols credible; its determination is entitled to great deference. See FLORA MV, 235 F.3d at 970. In light of this evidence, it was not implausible for the district court to find that the collision was inevitable as soon as the pilots agreed to a port-to-port pass. Cardinal's witnesses testified that they thought the channel was wide enough for both vessels. However, the district court noted that Omega's expert John Manders mistakenly believed that LOPEZ drew approximately five feet. For this reason, the court found his testimony unpersuasive. On the whole, it bears emphasizing that neither party established with any precision: (1) how deep the channel was near beacons 11 and 12, or (2) where exactly the vessels were at the moment of collision.

In rejecting Omega's theory of the cause of the collision, the district court took a permissible view of the evidence, which we must accord great deference. Omega has failed to meet its heavy burden of showing that the court's findings were clearly erroneous. See Anderson, 470 U.S. at 573-74.

B.

Omega next argues that the district court erred in finding Omega and Cardinal equally responsible for the collision. In admiralty cases, federal courts allocate damages based upon the parties' respective degrees of fault. United States v. Reliable Transfer Co., 421 U.S. 397, 411 (1975). The clearly erroneous standard "governs a trial court's allocation of damages among vessels." Mac Towing, Inc. v. Am. Commercial Lines, 670 F.2d 543, 547 (5th Cir. 1982)

(citations omitted). We have previously noted that "the calibration of culpability simply is not susceptible to any real precision." Stolt Achievement, Ltd. v. DREDGE B.E. LINDHOLM, 447 F.3d 360, 370 (5th Cir. 2006) (citation omitted). The trial court does not mechanically tally errors, but "must determine, based upon the number and quality of faults by each party, the role each fault had in causing the collision." Id. A court may apportion fault equally in a close case. See Reliable Transfer, 421 U.S. at 411 (holding that liability "is to be allocated equally only when the parties are equally at fault or when it is not possible fairly to measure the comparative degree of their fault"); Mac Towing, 670 F.2d at 547.

Given our conclusion that the district court did not commit clear error in its findings regarding the cause of the collision, we believe that the court likewise did not commit clear error in apportioning fault equally between Omega and Cardinal. The court found that Nichols and Robbins made an identical error: each assumed that the other's vessel had a shallow enough draft to allow it to give way in the channel. This predicate finding was not clearly erroneous. Because the court found that the parties made identical faults, it was appropriate to apportion damages equally.

III.

Omega next argues that the district court erred in relying on Douglas Halsey's opinion regarding the cause of the collision and the depth of Freshwater Bayou Channel. Omega contends that no competent evidence supports the theory that there was a bottleneck in the channel. Halsey admitted that his opinion was but one explanation for the collision, and he could not rule out the possibility that the vessels could have passed safely. He noted that the evidence involved "estimations" regarding "how far one vessel was out in the channel, how far one vessel was off the buoy, and we don't have any definitive measurements of the depths or the width of the channel that night." Omega contends that Halsey's candor reveals that his opinion was factually baseless. Thus, Omega

argues that reliance on this testimony tainted the court's findings of causation and fault. Cardinal argues that Halsey was qualified to provide expert testimony, and that his conclusions are supported by evidence in the record.

We review evidentiary rulings for an abuse of discretion. Canal Barge Co. v. Torco Oil Co., 220 F.3d 370, 375 (5th Cir. 2000); Seidman v. Am. Airlines, Inc., 923 F.2d 1134, 1138 (5th Cir. 1991). We will "reverse a judgment on the basis of evidentiary rulings only where the challenged ruling affects a substantial right of a party." Seidman, 923 F.2d at 1138-39 (quoting Jones v. Benefit Trust Life Ins. Co., 800 F.2d 1397, 1400 (5th Cir. 1986)). Omega does not challenge Halsey's competence: at trial, Omega stipulated as to his qualifications. Moreover, Omega presented no objection at trial to the district court's reliance on Halsey's testimony. Therefore this argument is forfeited. See Black v. North Panola School Dist., 461 F.3d 584, 593 (5th Cir. 2006). Even had Omega preserved the argument, it is frivolous. Halsey testified after hearing all of the evidence presented in court and reading all of the witnesses' depositions. Given that neither party has proven exactly how deep the channel was at the point of collision, the court had to balance various estimations of whether there was sufficient room. Nichols testified that a "bottleneck" in the channel made the collision inevitable. Halsey adopted this theory in his capacity as an expert. Because competent evidence supported Halsey's conclusion, the district court did not abuse its discretion in crediting Halsey's theory of the collision.

IV.

We now turn to Omega's argument that the district court erred in finding Clifton Lewis's release invalid. We hold that the court did not err.

Whether a seaman has validly entered into a release is a factual finding reviewed for clear error. Borne v. A & P Boat Rentals No. 4, Inc., 780 F.2d 1254, 1257-58 (5th Cir. 1986). The proponent of the release has the burden to prove that it "was executed freely, without deception or coercion, and that it was made

by the seaman with full understanding of his rights." Castillo v. Spiliada Mar. Corp., 937 F.2d 240, 244 (5th Cir. 1991) (quoting Garrett v. Moore-McCormack Co., 317 U.S. 239, 248 (1942)). Relevant factors include: the medical and legal advice available to the seaman at the time of signing, whether the parties negotiated at arm's length and in good faith, and whether there was an appearance of fraud or coercion. See id. at 245; Garrett, 317 U.S. at 248; see also Bass v. Phoenix Seadrill/78, Ltd., 749 F.2d 1154, 1160-61 (5th Cir. 1985) (noting that seamen "are wards of admiralty whose rights federal courts are duty-bound to jealously protect"). Adequacy of consideration is relevant only insofar as it reveals whether the seaman fully understood the consequences of his release. Simpson v. Lykes Bros. Inc., 22 F.3d 601, 602 (5th Cir. 1994). The district court correctly stated the law; its findings are reviewed for clear error. See Castillo, 937 F.2d at 245; Borne, 780 F.2d at 1257.

Omega argues that the district court "erred in focusing on the medical information available at the time of settlement." Because Lewis saw a doctor before signing the release, Omega contends that he had a sufficient understanding of his rights. Omega also argues that Lewis's demeanor while meeting with Breaud shows that he fully appreciated the rights he was signing away, including his right to potentially recover larger sums if his injuries worsened. Omega suggests that we focus on the parties' belief that, "[a]t the time of settlement, neither Omega nor Lewis believed that Omega held any responsibility for the subject collision." Lewis asks us to affirm the district court's finding. He emphasizes that the release was executed less than 48 hours after the collision, that the parties did not know the extent of his injuries, that Lewis did not speak to a lawyer of his choosing, and that he received a paltry sum for a serious injury.

We easily conclude that the district court's finding was correct. It was legally proper for the district court to consider the effect of Dr. Duval's incorrect

diagnosis on Lewis's understanding of his rights. See Garrett, 317 U.S. at 248. Dr. Duval's erroneous diagnosis—though perhaps an honest mistake—prevented Lewis from fully understanding his rights. See Robertson v. Douglas S.S. Co., 510 F.2d 829, 835 (5th Cir. 1975) ("A mistake with regard to diagnosis has long been recognized as cause for setting aside a seaman's release."). Omega's argument absurdly conflates seeing any doctor with receiving competent medical advice. This is not the law of this Circuit. See id. at 836.[1] Additionally, the district court did not err by inferring that the gross inadequacy of consideration revealed that Lewis lacked a full understanding of his rights. See Bass, 749 F.2d at 1161. Finally, Omega provides no authority to show why Lewis's belief that Cardinal was at fault for the collision has any bearing on his understanding of his rights as an injured seaman. If anything, Lewis's focus on this issue suggests that he did not understand the nature of his right to maintenance and cure from Omega. The district court did not err in finding that Omega failed to meet its burden of showing that the release was valid.

V.

The district court properly applied the law, and its findings of fact are not clearly erroneous. Its rulings are therefore in all respects

AFFIRMED.

---

[1] On this point, Robertson fully supports the district court's reasoning: "While it is true that a release should not be set aside for mutual mistake concerning the extent and outcome of the injuries, which are necessarily future rather than present facts, it does not follow that a release should not be set aside for mutual mistake concerning the nature of the injuries, which is a present fact. The legal distinction must rest on the medical difference between diagnosis and prognosis. A longshoreman who signs a release may have to take his chances that a properly diagnosed condition was the subject of an overly optimistic prognosis and that his injuries may be more serious and extensive than originally thought. However, the law does not require him to take his chances when the diagnosis is itself erroneous and he is suffering from a disease entirely different in nature from that diagnosed." 510 F.2d at 836.